UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CRIMINAL NO. 05-079(DRD) |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| LUIS M. RIVERA CRUZ, | * | |
| | * | |
| Defendant. | * | |

**OPINION AND ORDER**

Pending before the court is a request by the United States to review the Order of Release granted by the Hon. Magistrate Judge Gustavo A. Gelpí, (Docket No. 18). The United States argued that defendant Luis M. Rivera Cruz hereinafter referred to as "Rivera Cruz" presents both a flight risk and a danger to the community and hence detention is warranted. (See Urgent Motion to Stay Release Order Pending Appeal dated February 8, 2005, [sic], (dated in reality March 31, 2005) (Docket No. 23).

**BACKGROUND**

Rivera Cruz is charged, in a one count indictment, of Bank Fraud in violation of 18 U.S.C. 1344 in the amount of $2,403,100.00 consisting of sixteen different transactions over a period of six months. The bank fraud was a scheme to execute and attempt to execute a fraud against the Bank & Trust of Puerto Rico a federally insured institution, (Docket No. 7). The Magistrate Judge issued an Order of Release dated March 29, 2005, Docket No. 18. The Magistrate Judge granted pre-trial release based among others on the

1

following conditions:

     (1) A $100,000 bond secured by real property.
     (2) A $100,000 unsecured bond signed by attorney Prieto. (Personal and corporate general counsel of defendant.)
     (3) A second unsecured bond signed by defendants four sons who had attended the bail hearing.
     (4) Third-party custodian approved by PTS.
     (5) Curfew to be set by PTS.
     (6) Surrender of passports (the defendant possessed two passports; both passports are in the court's custody).
     (7) No travel outside the U.S. unless approved by the court.
     (8) No foreign travel unless approved previously by the court.
     (9) All other conditions of release set by PTS office.[1]

The Magistrate Judge determined after hearing evidence for eight hours on each date, March 18 and March 28, 2005, that defendant did not present a flight risk nor a danger to the community. See 18 U.S.C. 3142 (e), see Docket No. 19.

The United States presented evidence that defendant Rivera Cruz constitutes a flight risk because of his frequent travels to Santo Domingo (over 100 times) and to Cuba several times. The United States offered the testimony of family members as evidence of flight travels outside Puerto Rico (including the testimony of defendant's son Harold Rivera Orengo and his Administrative Assistant Rosa Martínez Nuñez).

Defendant Rivera Cruz has strong ties outside Puerto Rico because he has a business in the Dominican Republic consisting of a security consulting services, as accepted by his personal counsel Mario Prieto. The Magistrate also recognizes that he has a paramour in the Dominican Republic; although he has been married for twenty-six years to Gloria Pineda Cárdenas and has several children (defendant reported two sons but in

---

[1]    See Order of Release, Docket 19 p. 11.

2

reality has several more children including one with his paramour in Dominican Republic.) He also has acquaintances in Cuba (related to his religious beliefs) as admitted by his son Harold Rivera Orengo (hereinafter referred to as Harold or Harold Rivera).  The District Court adds that no witness accepted that he was ultimately traveling to Cuba when arrested although the evidence obtained from him (letters to be delivered to cult friends in Cuba) and intercepted phone calls (made by him to family members) from the MDC Guaynabo clearly indicate he was traveling to Cuba.  The defendant is a practitioner of a religious practice called "Palerismo" as admitted by his son Harold Rivera and other business related personnel. (Rosa Martínez Nuñez and counsel Mario Prieto.)  When he was arrested on the way to Santo Domingo he had several artifacts used by "Paleristas." He practices this religious cult in his farm in Cubuy as well as in Santo Domingo and in Cuba (also accepted by family members and business associates). A confidential informant will testify that he also uses human bones as part of his religious practice.

The Magistrate Judge further received evidence of defendant Rivera Cruz to fabricate and provide false and/or deceiving evidence. The defendant was found with two active passports. This District Court finds that the information to obtain the second passport provided by him as proffered by the United States Attorney was false– he claimed the original passport was lost in the deep waters of Vieques pursuant to the written request for the second passport but said old passport has no vestige of salt water damage. The new passport has never been used. The defendant further failed to advise Pre-trial as to his frequent travel to Cuba. The defendant even failed to advise Pre-Trial Offices of his children relating to other relationships. Defendant Rivera Cruz also failed to advise as to his precarious financial situation which includes a recent bankruptcy proceeding created

at least in part to a federal wage and hour  deficiency owed to guards working in his company.[2]  Finally, the defendant in two separate curriculum vitae documents found in his person, claimed falsely being a Naval Commander with Top Secret Clearance, with experience in nuclear weapons.

The United States claimed to the Magistrate Judge that said false information provided is probative of risk of flight as well as his dangerousness when combined with other evidence previously herein stated (a girl friend and a daughter in Santo Domingo, frequent trips and business relationships in the Dominican Republic and several travels to Cuba).

The most critical evidence to the undersigned Judge was the evidence of intent to harm and ability to present witnesses to deceive. **This type of evidence was discovered by the government's retrieving of defendant's phone calls from the public telephone used by defendant at the federal penitentiary obtained through a court order after the Magistrate granted the release order.** (See details provided infra.) The United States provided a proffer that a confidential informer stated to an FBI Agent that the defendant Rivera Cruz had intent to harm government witnesses and prosecutors in the instant case as well as judges involved in the civil fraud case parallel to the instant case. (Testimony

---

[2]    The court takes judicial notice that the defendant's company was sued by the United States Labor Department for federal wage and hour deficiencies in the District Court of Puerto Rico.  Elain Chao v. Universal Security Advisors, Inc., Civil No. 98-1527 (JAG). The counsel for the Labor Department is Evan R. Baroug. The parties stipulated a $400,000 judgment. (Docket No. 65).  The Labor Department requested contempt for non payment of the judgment. The contempt was desisted following the Notice of Bankruptcy under Chapter 11, See Docket No. 92, Joint Informative Motion Concerning Adjournment of the Contemp, hearing scheduled for March 19, 2004. (This case was formally randomly assigned to the undersigned but later transferred to District Judge García Gregory upon his coming to the bench as newly appointed federal judge.)

provided by S.A. Rafael Collado and Margret Till).  A list of names was found in the computer of defendant's administrative assistant, Ms. Rosa Nuñez, containing the names of counsel for Bank & Trust (relating to civil bank fraud case); the names of prosecutors, one former agent in the instant criminal case, the names of judicial officers in the bankruptcy petition, as well as the name of Evan Borouh, counsel for the U.S. Department of Labor assigned to the federal wage and hour complaint.

The government further presented evidence of receiving from a confidential informant that defendant had hired a hit man in the ward of Cubuy, Canóvanas, near defendant's residence. The government also proffered evidence, from a confidential informer, stated to an FBI agent, that defendant Rivera Cruz, referring to the persons indicated in a document contained in the computer list retrieved from the administrative assistant, "cuando venga de Cuba se van a joder todos"– translated by the Magistrate Judge as "when I return from Cuba they are all going to get fucked."  This confidential informer witness also overhead defendant's son Harold Rivera state that "si lo quitamos, no tendrán caso." ("If we take him off the picture, the government will have no case– translation by the Magistrate Judge). This last threat referred to government witness Guido Barletta Blasini, an eighty-year-old terminally ill person.

Finally, the government presented evidence, also corroborated by circumstantial evidence, of **wire taped phone calls from Rivera Cruz obtained after the Order of Release** that Harold, the son of Rivera Cruz, went to the home of a government witness, on the evening of March 18, 2005 at 8:00 p.m., Mr. Carlos Torres, a former employee of defendant Rivera Cruz. Harold banged on Torres' door and he took out of the trunk of his

car what looked like a rifle. (Docket No. 22, p. 8.)  Harold refused to speak to the FBI as to the matter. The threat to a government witness constitutes an obstruction of justice if the same occurred. 18 U.S.C. 3142 (f)(2)(B). United States v. Ploof, 851 F.2d 12 (1st Cir. 1988); see also Gavino v. MacMahon, 499 F. 2d 1191, 1195 (2nd Cir. 1974): "The Bail Reform Act, 18 U.S.C. §3146 et sec., like its predecessor, Rule 46(a)(1), Fed. R. Crim. P., guarantee that in a noncapital case the defendant will have the right to release on bail except in extreme and unusual circumstances, e.g., where **the threats to a government's witness would  jeopardize the court's own process.**" (Emphasis ours.) The Gavino citation was relied upon by the First Circuit Court in United States v. Abrahams, 575 F.2d 3, 7 (1st Cir. 1978).

Defendant's criminal history was also misstated by Rivera Cruz since he failed to advise the Pre-trial Offices of a manslaughter conviction that was reduced to involuntary manslaughter.

The United States also proffered that the defendant questioned the computer employee as to what would occur if the company computer files were to be erased and if the information could be subsequently recovered as strong circumstantial evidence to destroy evidence.

### THE MAGISTRATE JUDGE'S RELEASE ORDER

On the other hand the Magistrate Judge found that defendant was candid as to his religious inclinations, "Palerismo" and accepted the frequent travels to the Dominican Republic and Cuba. (But the defendant never accepted he was traveling to Cuba when arrested. Documentary evidence (letters hand carried by the defendant in his suitcase from

"Peter" Guerra, a friend and the intercepted phone calls made by defendant) proved the contrary. The defendant also accepted having a paramour in the Dominican Republic as stated by counsel Prieto. His paramour relationship was not informed to the Pre-trial officer. Defendant failed to advise of the manslaughter conviction.  Harold, however, testified that he knew for many years that his father was involved in an auto accident causing a death. (Harold was very young, barely 13-14 year old.) The denominated "hit list" was allegedly prepared by the administrative assistant and not by co-defendant Rivera Cruz. Other persons are in the list related to other federal court matters   (attorney Evan Borouh, counsel for the U.S. Department of Labor in the federal wage and hours claim).

As to the threat to government witness Guido Barletta, Harold Rivera denied that any conversations took place to take Guido Barletta "out of the picture";  but he accepted that a conversation took place that if he passed away there would be no case.  Rosa Martínez Nuñez, the administrative assistant of defendant Rivera Cruz, likewise denied having heard any statement about Barletta Blasini being "taken out of the picture." She did hear counsel Pesquera (counsel in the instant criminal case) state that if Barletta were to die due to cancer or due to his age there would be no case.

Defendant's son, Harold, explained that he did contact (but not personally) Carlos Torres, the government witness on March 18, 2005, through counsel Prieto but for legitimate reasons. The government witness, Carlos Torres, no longer worked for the company but had retained the company car. The vehicle was subsequently returned to Harold Rivera by the FBI agents. Harold negated having threatened Torres.

Attorney Prieto testified that he had known the defendant since 1998. Defendant Rivera Cruz had resided in Puerto Rico for the past twenty-six years. He had 6-7 children

7

from different relations. (Defendant Rivera Cruz had only informed of two sons to the Pre-trial Officer.)  He is open and candid about his extramarital relationship in the Dominican Republic with his paramour as well as his religious Palerismo practices (but see discussion infra N. 8).

The Magistrate Judge proceeded to analyze the evidence pursuant to the criteria set forth under the law, 18 U.S.C. 3142(g)(1)(1)(3)(4).

The Magistrate found the testimony of the government "credible" and of Rosa Martínez Nuñez, Harold Rivera (the son of defendant, and counsel Prieto "trustworthy"). However, as will be analyzed infra, the retrieved intercepted phone calls from the penitentiary of the defendant, not known to the Magistrate Judge at the time the Release Order was written, severely shatters the credibility of the witness of defendant because in the words of defendant he admits to contrary evidence that moved the Magistrate Judge in his Release Order.  Although the Magistrate Judge recognized that the United States was not obligated to produce the confidential witness that was allegedly threatened[3] the Magistrate Judge found the testimony "generic and perfunctory, quite conclusory as well as unreliable." Release Order, Docket 18, p. 8. However, as discussed infra, defendant's own words in the intercepted phone calls, prove that the testimony is essentially reliable. The Magistrate Judge concluded, because there was no other evidence, that the "hit list" evidence as presented was not reliable because "the government has not provided other details about the same, which could provide indicia of reliability of the hearsay." (Docket

---

[3] The case of United States v. Acevedo Ramos, 755 F. 2d 203, 208 (1st Cir. 1985) categorically holds, after performing an analysis of the legislative history of the Bail Reform Act, that the U.S. Attorney and the defense attorney may proceed via proffer.

No. 18 p. 9.) (Statements by confidential informer to FBI about threats to witnesses for example.) Relating to the alleged threat to the government witness of prior cases, the Magistrate Judge correctly stated that the "bare statement by the confidential informant to the FBI, because "no other facts [were present] to determine the reliability of the allegation," and  because the acts were apparently connected to the year 2002, they were not connected to the offense at bar. (the Magistrate was obviously referring to threats to the Bankruptcy Judge, to the lawyer of the U.S. Department of Labor and other persons in the "hit list"). The witnesses were not related to the instant case and thus did not comply with the requirements of <u>United States v. Ploof</u>, 851 F.2d 2, 11-12 (1st Cir. 1988) (requiring that the threat be related to the same criminal case as the bail). Finally, the court refused to provide weight to the evidence that Harold Rivera, the defendant's son, had threatened a former company employee, a known CW #I, who is to provide testimony as an insider related to the $2.4 million dollar bank fraud. The Magistrate Judge provided more weight to the version that the employee remained with a company auto. (Docket 18 p. 9.) However, the intercepted telephone conversations, not then known to the Magistrate Judge, provide circumstantial evidence that the visit was in fact related to a threat, coercion, and /or intimidation to a government witness in this case. (See discussion infra.)

The Magistrate Judge opined that "the government has not met in this case the elevated standard of proof required to detain a defendant on dangerous grounds." (Docket No. 18 p. 9.)

The Magistrate Judge further concluded that the defendant did not constitute a flight

risk afer "a pondered analysis of the particular facts of the case."[4]  **The District Court agrees with the analysis of the court with the facts as then known by the Magistrate Judge. However, the intercepted telephone calls of the defendant from MDC Guaynabo to his girl friend in Santo Domingo, to his wife, and to his son Harold paint a totally different factual scenario and force a contrary decision.**

### ANALYSIS

As previously stated herein, the United States originally sought a request to stay which was granted as the court was concerned with defendant's potential danger to the community based on threats to government personnel, in the **instant case** as well as to those who acted in other cases, (Bankruptcy Judges, attorneys handling federal wage claims against the corporation, U.S. Attorneys, witnesses and even a federal judge who tried civil fraud case), see Docket No. 25.

The court set an immediate hearing for April 6, 2005, Docket No. 26. The United States insisted in an emergency motion that co-defendant was both a flight risk and a danger to the community in a motion entitled Urgent Motion to Stay Order of Release, Docket No. 23. As to flight risk the United States stressed the contradictions between witness testimony and the evidence. The administrative assistant to Rivera Cruz, Rosa Martínez, insisted that he was not traveling to Cuba; as well as his son Harold Rivera. Yet the evidence in possession of the traveler, defendant Rivera Cruz, revealed totally the

---

[4]     The Magistrate Judge concluded that the defendant has considerable contacts in Puerto Rico, he had knowledge of the bank fraud for some time. Further, although the statute has a maximum of thirty years, his Guideline Range (now advisory under <u>United States v. Booker</u>, 125 S.Ct. 738, 160 L.Ed.2d 621) is only 33-44 months. He concluded that "there is no incentive for him to flee. (Docket 18 p. 10.)

contrary. He was traveling with letters signed by "Peter," Pedro Guerra, directed to family members and friends in Cuba. Further, Harold Rivera  identified a photograph as that of Pedro Guerra an employee of Cuban nationality. The intercepted telephone calls, not cited then by the U.S., reveal that Rivera Cruz stated that if the envelopes were discovered it would be bad for him. (See discussion infra.) Even though the Magistrate concluded as a fact that the travel to Cuba was to take place, this District Court is left with the distaste of witnesses openly deceitful as to defendant's travel to Cuba. The letters themselves, without the revelation of the retrieved intercepted calls, undoubtedly show that defendant was on this trip traveling to Cuba.[5] (The letters were found in Rivera Cruz's checked baggage.)

Further, the United States sought to have Pedro Guerra to testify at the bail hearing; Mr. Guerra agreed. However, he went to Luquillo to visit some friends, Harold agreed pick him up and take him to court. Harold did not pick him up on Sunday before the trial and Harold's wife did not pick up him on Monday, the day of the trial, until the evening hours. The U.S.A. concluded "clearly, Harold Rivera, intentionally left Mr. Guerra in Luquillo so that he would not appear." (Docket No. 23 p. 4.) Guerra was to provide testimony as to travel by Rivera Cruz in that occasion to Cuba to deliver his letters to friends notwithstanding the testimony by Harold Rivera and Rosa Martínez to the contrary. The testimony of Guerra however is no longer necessary since not only did the Magistrate accept the probability of the trip but the retrieved intercepted telephone calls constituted

---

[5]     It is unquestioned as a matter of law that the United States may request to retrieve and obtain calls of defendant from the penitentiary since the defendant is warned in large signs that the phone call is subject of wire tapping. See Docket No. 20, Motion Requesting the Retrieving of Defendant's Phone Calls and Memorandum filed by the U.S. and immediate granting of the motion by the Magistrate Judge, Docket No. 21 (all filed and entered after the Release Order, Docket No. 18).

an admission of defendant's travel.

The United States also stressed the maliciously false and misleading statements contained in the two resumes of defendant that accompanied him while traveling to foreign countries. The resumes stated that he was "looking to obtain a management position which would allow me to successfully realize my education, skills, abilities, and experience with the challenge and opportunity in a company . . . to provide contracted services to the United States and other governments around the world. [defendant's claims] **Top Secret Clearance** granted by the United States government [he further claims](expertise in) **Nuclear Weapons** Qualified set up operations . . . managed a nuclear assembly team and [experience as] a Naval Intelligence Commander." (Emphasis ours.)  In the second resume Rivera Cruz claims the following: Licensed Professional in the Displacement of Biological Weapons . . . military security strategy of Latin America." (Docket 23 p. 5.) (The information as to his experience in Nuclear Weapons, Naval Commander, and Top Clearance is clearly false.) These representations are of concern to the court being those of a business man providing security services traveling in foreign countries.

Defendant Rivera Cruz further has a daughter in Santo Domingo and has a warm strong paramour relationship with her mother to the point that he made telephone calls to her from MDC Guaynabo. (See discussion infra.) Strangely Rivera Cruz failed to mention his daughter in the pre-trial request and four (4) other children recognizing only sons Diego and José.

The strongest argument of the United States is based on the criteria of danger to the community. There is a confidential informer (CI#1) who stated to an FBI Agent,

Margaret Thill, that the defendant, pointing to a document containing  a list with names of persons (those in the computer),  stated that "when I return from Cuba they are all going to be fucked." (CI #1 is insider Carlos Torres, a corporate employee; defendant Rivera Cruz  clearly identified him as the informer.) (See discussion infra.) There is no doubt that this statement is double hearsay normally not subject to much weight. Except that the list of persons contains names of persons that have importantly acted in federal judicial cases against the defendant. As stated before the "hit list" contains the names of a lawyer who handled the wage and hour case instituted by guards of defendant's company and the names of U. S. Attorneys and FBI agents working in the instant case. Further, the federal judge who handled the civil fraud case of defendant's security company is also on the list.

The matter may be  brushed aside  **except if the defendant performs a further act which may show proclivity to violence** toward a person in those prior cases or in the instant case. He clearly did in the opinion of the court, moving to threaten and/or intimidate the insider witness CI #1, (Carlos Torres), in the instant case. (See discussion infra.) The matter of the hiring of a hit man in Cubuy by Rivera Cruz is also testified by CI #1 and CI #2. According to CI #1 Rivera Cruz was overhead stating that without Guido Barletta Blasini "they do not have a case" and Harold Rivera stated "if we kill him [Barletta] they do not have a case." All these statements coming from CI #1 and CI #2 may be hallow words of little concerns unless there is a movement of violence or intimidation  against CI #1 and CI #2 attributed to defendant. The words of defendant Rivera Cruz through the taped phone calls from MDC Guaynabo clearly provide reliable circumstantial evidence that Rivera Cruz identified him (by direct evidence)  and further moved against him using his

son Harold as an agent. (See discussion infra.)

The United States further alleges that the defendant practices the dark side of Paleria. CW #1 states that Rivera Cruz uses human bones, possesses numerous horns which are used to cast spells on people and upon dark spirits. A book of black magic was also found in his possession and said book allegedly speaks of dark angels commanding their presence and casting spells and dark spirits on people. The United States simply alleges that his is part of the character of defendant Rivera Cruz showing that he is capable to carry on a real threat "they are all going to be fucked"– referring to the persons in the "hit list."

The United States has requested a de novo review of the Magistrate's Release Order. The court is required to perform a de novo review. United States v. Tortora, 922 F.2d 880, 883 n. 4 (1st Cir. 1990).[6]

The instant case is not covered by the presumption of detention found in the Bail Reform Act of 1984 established at 18 U.S.C. 3142(f)(1)(2) and (e). (The instant case is not a crime of violence, nor is a case where the sentence is life imprisonment or death nor is this a case of the Controlled Substances Act (21 U.S.C. § 801 et sec) where the potential applicable sentence is ten or more years under 18 U.S.C. 3142 (f)(1)(a)(b)( c) nor a defendant with a prior criminal state or federal record under 18 U.S.C. 3142(f)(1)(I).)

The instant case is therefore to be determined examining the factors required to be examined at 3142(g)(1)(2)(3)(a)(b) and (4). The court is therefore required to take into

---

[6]     The court also recognizes the illustrated opinion of District Judge Keeton in United States v. Philiphs, 732 F. Supp. 255, 2548-259 (D. Mass1990), requiring "the court to exercise independent consideration of all facts properly before it."

consideration the following criteria:

(1) The nature and circumstances of the offense;

(2) The weight of the evidence as to guilt or innocense;

(3) The history and characteristics of the person, including past conduct;

(4) The nature and gravity of the danger posed by the person's release.

The court should examine all circumstances and then decide by preponderance of the evidence whether the evidence preponderates as to bail or as to detention. However, detention of defendant pending trial is permitted only if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community . . ." 18 U.S.C. 3142(e). Conditions of release need not absolutely guarantee community safety or appearance at trial, but rather only provide objectively reasonable assurance of these goals. United States v. Tortora, 922 F.2d at 883. The District Court must articulate the particularized reasons underlying its independent findings. United States v. Tortora, 922 F.2d at 883.

The court may, of course, accept proffered evidence by the parties under the Bail Reform Act. United States v. Acevedo, 755 F.2d 203, 208 (1st Cir. 1985) (The court citing the House Judiciary Committee H.R. Rep. No. 907, 91st Congress, 2nd Session 182, 184 (1970). Further the rules of evidence do not apply. Id.

The court proceeds to analyze the statutory criteria in **seriatim** fashion.

As to the nature and circumstances of the offense, a bank fraud of $2.4 million, there being no evidence of violence by defendant undertaken within the crime itself, this criteria by itself undoubtedly calls for bail.

The weight of the evidence. The United States proffered at the hearing that the

weight of the evidence is strong "all other similarly situated defendants have folded and have pleaded." Further there are various confidential informers who will testify including an insider from the business of the defendant. The court further notes that there is a recognized critical importance repeated several times as to witness Guido Barletta, "that without him there would be no case." Said witness is currently available notwithstanding that he is over eighty years old. On the other hand this court recognizes that the potential sentence in this case even considering that the Guidelines are now advisory, is not to be very long (between three to four years in prison).[7]  This criteria , the weight of the evidence is strong, seems to favor detention standing on its own.

History and characteristics of the person. Defendant Rivera Cruz has not been truthful with the Pre-trial Officer. He failed to inform basic family matters. He only recognized two children while he had 6-7 according to attorney Prieto. He further failed to inform that he has had for a considerable time a long standing relationship with a girl friend in Santo Domingo named Carolina and has a daughter with her. The relationship continues as was evidenced by a wire tapped telephone call retrieved from the public phones at MDC Guaynabo,  the calls were all obtained **pursuant to a court order filed and granted one day after the Order of Release. (See Docket No. 21.)**  In the intercepted telephone conference of March 18, 2005 at 8:39 p.m. with Carolina the defendant clearly identifies an insider named Carlos Torres as the person who provided critical corporate information and who identified him as he was about to board a plane to Santo Domingo and later to Cuba. "He gave everything to the feds and he set up a whole bunch of . . . fabricated things

---

[7]  The court notes that this case has a potential enhancement for obstruction of justice as discussed infra.

. . . yes I know it was him because he gave them some documents that [he was] the only one that had them . . . he was the one that went with them and told them look the one that goes there is him." [Retrieved telephone conference of 3/18/2004- 8:39 p.m. p. 2-3.[8] Further, through the telephone conference with Carolina it is detected a sense of desperation on the part of Rivera Cruz incremented by the sobbing and crying of the girl friend Carolina. The relationship is not only personal but also professional since he request her to cover up with clients in Santo Domingo the fact of his arrest. "Look listens before I forget. Did you speak with Doña Carmen? [He obviously spoke on the phone to Carolina before this time]. Tell those people, Luis eh, that they don't allow me to be seen. **That I am still in intensive. Or rather, but it's not that I am seriously ill. Simply just, just to monitor me.**" (Phone call Carolina 3/18/05 p. 10.) (Emphasis ours.)  Finally, it is clear that defendant was economically maintaining Carolina since he was transferring eight hundred dollars to her. (Telephone call to Carolina 3/18/2005 p. 11-12.)

Defendant further "forgot" to advise the Pre-trial Officer of his poor financial condition (one of the statutory criteria under history and characteristics of the person) when he failed to advise he was operating business under bankruptcy.  Further, he failed to advise the Pre-trial Officer that he had a criminal manslaughter resulting from a car accident.

Moreover, he set up and an intricate plan in court including providing false testimony

---

[8]    The relationship  with Carolina is alleged by counsel Prieto to be an open relationship. But when Harold was on the line at the beginning of the telephone call, before his wife Gloria Pineda entered the conversation at the end, defendant Luis Rivera stated referring to a VHS tape "be careful that Carolina is there." Telephone call 3/17/05, 2:31 p.m. p. 3.) Further, the relation can not be considered open when Rivera Cruz and Harold agree to henceforth call her "Mr. Arias". Telephone call 4/01/2005 p. 2.

that he was not on his way to Cuba only to be "trapped" by his own admissions in retrieved telephone calls from MDC Guaynabo. The fact was that his son Harold and administrative assistant Rosa Martínez denied under oath at the bail hearing that they had knowledge that he was to subsequently travel to Cuba. However, letters in his suit case revealed that he was carrying letters from "Peter," Pedro Guerra, a native of Cuba to friends in Cuba. (Ex. 10.)  Further, in a retrieved telephone conference with Harold Rivera, his son, on March 17, 2005 at 3:02 p.m. defendant stated at p. 16-17 "that's what I said that since Pedro sent those letters, you know, I had them [in the suitcase] because he sent them to, to . . .  I hope he didn't put there in the [u.i.] in any way the word Cuba because then I am fucked up." Prior thereto on that same date on a retrieved telephone call by defendant, again to Harold, a few minutes earlier on March 17, 2005 at 2:31 p.m. defendant Rivera Cruz stated concern that the suit case, wherein the letters were packed, had not been returned by the federal authorities to the family or him. "The briefcase and  . . . things from . . . the suit case, they haven't turned in to me any of that." Telephone conference 3/17/2005 2:31 p. 2-3. Further, later in the same telephone call he stated at p. 14 "then, but they didn't give you the suitcase . . . ask Pedro . . . **if in those letters he put something about Cuba, because if he put something about Cuba, I'm screwed.**" (Emphasis ours.) The letters in fact clearly indicate that the defendant was delivering letters from Pedro to persons in Cuba. Notwithstanding, Harold Rivera, who participated in those telephone calls testified later after these phone calls were made together with Rosa Martínez that Rivera Cruz was not traveling to Cuba. The matter is a pure and simple fabrication. It clearly shows participation in a clear intent to deceive. The Magistrate Judge was not  deceived but did

not provide much weight to the matter. Notwithstanding, the Magistrate Judge did not listen to the retrieved later obtained telephone conference of defendant to his family in MDC Guaynabo and hence could not detect the significance of the attempt to deceive through openly false testimony.

The defendant was further carrying with him to the Dominican Republic and Cuba two resume letters in his briefcase wherein the defendant falsely represented that he had Top Secret Clearance from the U. S. Government having an expertise in nuclear weapons, a Naval Intelligence Commander (reserve), managed a nuclear assembly, licensed professionally in the displacement of biological weapons with an expertise in military security strategy of Latin America. Again, this shows "character" of deception and untruthfulness.

The United States further proffered that they had requested Pedro Guerra to testify (relating to the letters– of him in the suitcase of Rivera Cruz). Pedro Guerra accepted. Harold Rivera had offered to pick him up in Luquillo enabling him to testify. Harold Rivera failed to show up on Sunday even though he was aware that Guerra was to testify in court on Monday. Mr. Guerra asked Harold's wife to pick him up but she didn't make it conveniently until the evening.

Considering the serious factual misrepresentations and plain untruthful statements, the court provides credibility to the United States proffer that a confidential informer provided evidence that Rivera Cruz asked Christian, the computer technician, "what would happen if the computer files were to be erased and if those could be later recovered." Magistrate Judge's Order of Release, Docket 18 p. 6.   This proffer is enhanced by the following coded interchange between Harold and defendant Rivera Cruz on the telephone

conversation of April 1, 2005, p. 5.

> LRC: All right, but you keep quiet at the office . . . remember that anything is [ui].
> If you get into the office . . . and shut yourself in there with . . . with Christian.
> H: Yes, guys we had to take out as many documents as were here everything . . .
> and . . .  wait.
> LRC: All right, look, . . . I have to give you some specific instructions . . .
> H: Yes, I am going there with Francisco.
> LRC: Don't get in there [ui], that's the problem. [Probably referring to the fact that
> the defendant wanted the meeting to be strictly between Harold and Christian, the
> computer person.]

Finally, by having a warm long-lived love affair with a girl friend in Santo Domingo, by having business in Santo Domingo, by having children in Santo Domingo, by traveling around one hundred times to Santo Domingo, being fifty-two years old, defendant's ties to Puerto Rico are not that strong. He could very well leave the bankrupt security company, leave it to his son Harold to administer and be tempted to flee rather than face a potential sentence for bank fraud enhanced by the threats to government witnesses and obstruction of justice (he did allegedly not travel to Cuba yet potentially quarterbacked evidence to the contrary) and/or he attempted to destroy evidence and/or he impeded, using Harold as his agent, Pedro Guerra from testifying by trickery; the matter was again confirmed by the retrieved telephone call on Monday, April 4, 2005 at 9:41 p.m.

> LRC: I was told that Pedro was interviewed?
> H: Yes, but he didn't say anything . . . that is making it up there . . . nonsense, thats
> because he did not go Monday to the hearing . . . (April 4, 2005, 9:41 p.m.)

Because credibility has been provided to the proffers made by the United States as to statements and facts provided by the confidential informers corroborated by the telephone conferences of defendant Rivera Cruz showing untruthfulness, deceit, and obstruction of justice,  the criteria of history and characteristics of the person now clearly falls on the side of detention.

The nature and seriousness of the danger to any person or the community that would be posed by the person's release. This criteria requires the court to evaluate the credibility of the statement attributed to the defendant Rivera Cruz from a confidential informer that "when I return from Cuba they are all going to be fucked." This statement refers to a document consisting of a print of the names of government attorneys handling cases of defendant (including of defendants corporations), FBI agents, AUSA district attorneys and even a federal judge handling a prior civil fraud case against the corporation of the defendant. The list contains the name of the counsel for the Labor Department who handed the federal wage and hour claim against the corporation of the defendant wherein contempt charges where originally filed but later desisted because of bankruptcy proceedings.

As stated by the court, the matter of the "hit list" did not concern the Magistrate Judge because he found no further evidence of reliability and some of the persons in the list were not related to the instant criminal case under United States v. Ploof, 851 F.2d at 11-12. The court also received evidence that Carlos Torres, the insider CI #1 already identified by defendant as informer in the phone call with his paramour, Carolina, on March 18, 2005 at 7:20 p.m. p. 2-3 , received an intimidating visit on March 18, 2005 by Harold Rivera. It is alleged by the CI that Harold banged on his door and was later seen by Torres taking out of the trunk of Harold's car a rifle. The Magistrate Judge provided credibility to the defendant's theory that the visit was related to the return of the car, Release Order, Docket 18 p. 9. The court may have also been so persuaded but the tapes of the telephone calls with the family and particularly the tape telephone call of defendant to his wife the very next morning on March 19, 2005 at 8:04 a.m.; immediately upon him being

allowed to use the phone, as confirmed by his admission that he had not been able to use the phone until then, confirm to the court that it is the CI who is to be granted credibility.

The first line of defense of the defendant as to the statement attributed to him "when I return from Cuba, they are all going to be fucked" referring to the hit list, was that defendant was not traveling to Cuba as was testified at the bail hearing on March 18, 2005, by Harold Rivera and Rosa Martínez. (Harold had the benefit that his father had already told him a day before that if the letter of Pedro Guerra were found in his suitcase he was in deep trouble. ("If in those letters he put something about Cuba, because if he put something about Cuba, I'm screwed." (Telephone conference of March 17, 2005, at 2:31 p.m.)[9]  The first line of defendant that "he did not go to Cuba" was shattered by the letters themselves in the possession of the defendant (the letters of Pedro Guerra), a native Cuban, to Cuban friends  and by the taped retrieved phone calls.

Second, there is no doubt that Harold is an armed person because his father recommended him after March 18, 2005 to unarm himself ("and tell Harold to put away . . .  his gun to, to put it away in the house whatever. Because even though he has permission to carry and all that I do not want the guy to say that, that he threatened him and then he gets detained, they find the gun and then they say it's true.") (Nobody was then speaking publicly of a threat except defendant himself.) (Telephone conference March 19, 2005, 8:04 a.m. (But the threat had already occurred on the evening of March 18, 2005 at 8:00 p.m.. AUSA proffer, Docket No. 23 p. 8.) As stated before CI #1, Carlos Torres,

---

[9]       The concern as to the letters is repeated in the phone calls to Harold that same day at
         3:05 pm. on 3/17/05 p. 16-17: "That's why I said [in the previous phone call] that since
         Pedro sent those letters [with me] I had then because he sent then, to . . . I hope he didn't
         put there in the (u.i.) (unintelligle), in any way the word Cuba, because I'm fucked.

alleges to have received a threat on March 18, 2005 at around 8:00 p.m. consisting of a visit from Harold who knocked in his door and was observed by Torres retrieving what looked like a rifle from the car.

The very next morning after being locked in the room until eight (telephone call from Rivera Cruz to wife Gloria Pineda March 19, 2005 at 8:04 a.m. p. 6.)  The defendant immediately advises his wife that he wants Harold to visit him (you can come, I'm interested in seeing Harold also because  . . . [defendant does not state the reason] id. p.11)  Further, a few seconds after defendant states "Eh, I need to talk to Harold urgently" and the topic was in Spanish "pa que me ponga al día de lo que pasó" which this court translates as "so that he can update me as to what happened."  The court understands that his translation is more accurate than "so he'll bring me up to date."  The wife then advises that "they will be at the office in a little while."  Then surprisingly the defendant after stating that he needs to urgently speak to Harold and that he needs an update states that "what a rat, this guy, man."

The court understands that the defendant is referring as "a rat" to CI #1, Carlos Torres, and that the "updates" he wants to talk urgently to Harold about is the visit of Harold to Carlos Torres.  Further, this is precisely why on this same date he recommends to his wife to tell Harold to unarm himself. The court asks was this a visit to intimidate and coerce or was this visit merely to request the return of a car. The return of a car is not an "urgent" matter to discuss with Harold and not a matter to recommend that Harold unarm himself after it occurred. The request to speak to Harold urgently to have Harold visit defendant in the prison and the advice to unarm Harold obviously refers to the "rat," Carlos Torres, and to the visit that was made to him the night before. The court, therefore, credits

23

the version of  Carlos Torres, CI #1. Hence, the defendant is a danger to the community under Subsection (f)(1). Further, the court makes a specific finding pursuant to the mandate of <u>United States v. Bluff</u>, 851 F.2d at 12 that an event of witness intimidation has occurred and/or obstruction of justice under Subsection (f)(2)(B). Id. The criteria of danger to the community favors detention.

Considering all factors the court concludes that defendant is a danger to the community under §3142(f)(2)(B) and that no condition or combination of conditions set forth in §3142( c) will reasonably assure the safety of any other person in the community. <u>United States v. Bluff</u>, 851 F.2d at 12.

The court also considers the defendant a flight risk not only because he has  weak ties to society in Puerto Rico because of his strong connections to Santo Domingo (personal, business, and family, a paramour and a daughter), as stated above but because in seeking a bondsman in a telephone conference of March 17, 2005 at 2:31 p.m.  p. 16-17, with family members, the defendant stated the following: ". . .what I want you guys to do is to concentrate on the bail please . . .  Because it's easier to pay twenty-five or thirty thousand dollars [the percentage required by the bondsman] than to [put][down] all the money, **even if the money is lost, that doesn't matter**. But, but, I have a guarantee that if they assign me whatever amount it is, fuck, I have the guy, the bondsman there." (Emphasis ours.)  The court is of the opinion that the phrase "even if the money is lost" constitutes a slip, a  prediction of an omen of flight. Hence, the defendant is also a flight risk.

The court is of the opinion that the factual scenario herein described satisfies the threshold of danger to the community under the standard of "clear and convincing

24

evidence" required by <u>United States v. Palermo</u>, 431 U.S. 739, 750 (1987)[10] and of flight risk satisfied by the preponderance of evidence under <u>United States v. Patriarca</u>, 948 F.2d 789, 793 (1st Cir. 1991).

**The defendant, Luis M. Rivera Cruz, is therefore to REMAIN DETAINED.**

**IT IS SO ORDERED.**

At San Juan, Puerto Rico, this 5 day of May 2005.

s/ Daniel R.Domínguez
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**

---

[10]     "Clear and convincing evidence" has been interpreted as "strong and reliable. . . (evidence)."  <u>United States v. Acevedo-Ramos</u>, 755 F.2d at 208.